**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**EARNEST E. FOX, JR.,**

       **Plaintiff,**

                                **Civil Action 2:12-cv-635**
      **v.**                            **Judge Peter C. Economus**
                                **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income.   This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition, and the administrative record.   (ECF Nos. 9, 14, 7.)   For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

### I. BACKGROUND

Plaintiff protectively filed his application for benefits on April 16, 2009, alleging that he has been disabled since April 7, 2007, at age 44.   (R. at 170-76, 177-79.)   Plaintiff alleges disability as a result of rheumatoid arthritis in his knees, feet and hands, and carpel tunnel in both wrists.   (R. at 243.)   Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a de novo hearing before an administrative law judge ("ALJ").   ALJ Ken B. Terry held a video hearing on March 16, 2011, at which Plaintiff, represented by counsel,

appeared and testified.   (R. at 42-67, 69-70.)   Bruce S. Growick, a vocational expert, also

appeared and testified at the hearing.   (R. at 67-73.)   On April 29, 2011, the ALJ issued a

decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.

(R. at 18-28.)   On May 21, 2012, the Appeals Council denied Plaintiff's request for review and

adopted the ALJ's decision as the Commissioner's final decision.   (R. at 1-4.)   Plaintiff

thereafter timely commenced the instant action.

## II. HEARING TESTIMONY

**A.      Plaintiff's Testimony**

At the administrative hearing, Plaintiff testified that he attended school through the

eleventh grade.   (R. at 43.)   With respect to mental limitations, he indicated that although he

can read "[s]omewhat," he cannot read a newspaper.   *Id.*   He further testified that he would be

unable to write a letter explaining why he believes he is disabled, and that he is unable to do

addition and subtraction necessary to handle money and make change.   Plaintiff also testified

that he could not read a grocery list written by someone else or write one that someone else

could read.

Plaintiff also testified as to his physical limitations.   He testified that he suffers from

rheumatoid arthritis ("RA"), which affects his lower back, both knees, feet, and shoulders.   (R.

at 44.)   He indicated that he has undergone surgery on both of his feet due to RA and to correct

hammer toes, and that he is considering a third surgery.   (R. at 44, 62.)   He also testified that

his physician stated that he may need surgery on his back at some point in the future due to RA.

When asked by the ALJ, Plaintiff denied that the surgeries on his feet brought him relief.   (R. at

45.)   He stated that the condition in his left foot has worsened since surgery.   Plaintiff further

indicated that two months prior to the hearing he began to use devices that go into his shoe, called orthotics, for the second time.   He stated that he used similar devices approximately a year prior to the hearing.   He testified that the devices caused his pain to worsen when he used them the first time.   (R. at 46.)   Plaintiff also indicated that beginning three to four months prior to the hearing he began to require the assistance of a walker in the mornings to steady himself and get up.   He stated that he sometimes uses the walker during the day as well.   (R. at 48.) Before switching to a walker, Plaintiff testified that he required crutches for approximately a year.   He indicated that he cannot use a cane because RA in his wrists prevents him from gripping the cane sufficiently.

Plaintiff testified that he gets an average of three or four hours of sleep per night.   (R. at 49.)   He stated that pain in his lower back and knees prevents him from sleeping through the night.   He also testified that he has difficulty walking up stairs because his knees and ankles give out without notice.   Plaintiff indicated that he had stopped driving two months prior to the hearing due to pain in his knees and ankles.   He testified that his joints often become swollen, and stated that his hands become so swollen sometimes that he cannot unscrew the cap from a bottle of soda or tie his shoes.   (R. at 53.)   Plaintiff testified that he believes his condition is worsening rather than getting better.   (R. at 54.)

In terms of prior work experience, Plaintiff testified that he worked maintenance at an apartment complex from 1994 through 2004.   He indicated that he was an assistant, and that the job required him to lift up to 40 pounds at a time.   Plaintiff testified that he was terminated from that job because of his physical symptoms caused by RA.   He stated he became unable to keep up any longer and that he missed work due to various medical appointments.   *Id.*   Plaintiff

3

estimated that he can stand up to 25 minutes at a time.   (R. at 47.)   He testified that he can only walk approximately a half a block.

Plaintiff also testified as to his activities of daily living.   (R. at 54.)   He stated that he "basically just sit[s] around the house" during the day.   *Id.*   He stated that he may go to the porch or to the yard to get the paper or mail.   He testified that his mother, with whom he lives, does the household chores.   He stated that she does the grocery shopping, but that he might help her put groceries away when she gets home.   Plaintiff testified that he occasionally helps with the dishes.   He indicated that doctors encourage him to exercise and do various maneuvers with his feet and ankles to keep them from becoming more stiff.   (R. at 60.)

## B.     Vocational Expert Testimony

Bruce Growick testified as the vocational expert ("VE") at the administrative hearing. (R. at 67-73.)   The VE testified that Plaintiff's prior maintenance position classified as heavy, semi-skilled work.   He further indicated that the skills are nontransferable.   The ALJ asked the VE to assume a hypothetical person of Plaintiff's age with an eleventh grade "special education."   (R. at 70.)   The ALJ asked the VE to further assume that the individual would be capable of light work, and that he would be able to carry, push, or pull with his left hand up to 20 pounds occasionally and 10 pounds frequently; sit for four hours at a time in an eight-hour workday; stand or walk a total of two hours per day in an eight-hour work day; and sustain a normal break schedule.   The ALJ asked the VE to further assume that the person would be precluded from climbing ropes, ladders, and scaffolds; but that he could perform occasional climbing of stairs and ramps and could perform occasional balancing, stopping, kneeling, crouching, and crawling.   In addition, the ALJ asked the VE to assume the person suffers no

4

significant manipulation limitations; no significant visual or communication problems; and no environmental limitations except that he could not have concentrated exposure to vibration. Lastly, the ALJ asked the VE to assume this person would be limited to simple, unskilled, repetitive tasks with no more than occasional overhead reaching bilaterally.   (R. at 70-71.) Specifically, the ALJ indicated that this hypothetical person could perform regular reaching at chest level with regular handling, fingering, and feeling, but that he was limited to no overhead bilateral reaching.   Based on the ALJ's hypothetical, the VE testified that such an individual could not perform Plaintiff's prior work experience.   The VE further testified that jobs exist in the local and national economy that such a person could do, including sedentary and light factory-based work, such as assembly work or machine feeding.   (R. at 71.)   The VE also testified that such an individual could perform the functions of a production clerk.

### III. MEDICAL AND EDUCATION RECORDS

**A.      Physical Limitations**

**1.      Dr. Hawthorne/Fairfield County Health Department**

Plaintiff received primary care at the Fairfield County Health Department from January 2002 until at least August 2008.   (R. at 453-581.)   He reported pain in his feet and ankles during numerous visits from 2002 through 2008.   (R. at 476, 478, 479, 483, 486, 488, 490, 502, 503, 505, 511, 517, 521, 525, 526.)   He also reported swelling in various joints numerous times from 2002 to 2006 (R. at 491, 493, 495, 500, 510, 513, 514, 515, 518, 524, 527.)   On May 10, 2007, Plaintiff presented with complaints that his left wrist was so swollen that he was unable to use his hand.   (R. at 487.)   He indicated that he had previously experienced this level of swelling.   Two months later, in July 2007, Dr. Hawthorne referred Plaintiff to Dr. Ott, a

5

Rheumatologist.   (R. at 485.)   In June 2008, she referred him to a pain-management specialist.
(R. at 451.)

**2.      Esberdado Villanueva, M.D.**

On July 8, 2007, Dr. Villanueva reviewed the record on behalf of the state agency.   (R.
at 358-65.)   Upon review of Plaintiff's records, Dr. Villanueva opined that Plaintiff is limited to
lifting or carrying 20 pounds occasionally and 10 pounds frequently.   (R. at 358.)   He further
opined that Plaintiff is limited to standing or walking for six hours in an eight-hour workday, and
sitting for six hours in an eight-hour workday.   In addition, Dr. Villanueva opined that Plaintiff
suffers no limitation in his ability to push and pull.   He further indicated that Plaintiff is unable
to climb ladders, ropes or scaffolds, and that he is able to frequently kneel, crouch or craw.   (R.
at 360.)   In addition, Dr. Villanueva reported that Plaintiff should limit handling and fingering
to the left hand.   (R. at 361.)

**3.      Stephanie J. Ott, M.D.**

Plaintiff visited Dr. Ott, a Rheumatologist, for the first time on August 14, 2007.   (R. at
369.)   Dr. Ott noted that Plaintiff complained of pain in his feet, left ankle, hands and shoulders.
He indicated that he feels stiff most of the day and continues to experience "marked swelling,"
even with medication.   *Id.*   He reported that his feet "constantly burn and hurt."   *Id.*   Plaintiff
reported that cold and over-activity cause his symptoms to worsen.   Dr. Ott noted "clear signs
and symptoms of rheumatoid arthritis on exam."   (R. at 370.)   She discussed various treatment
options with Plaintiff and adjusted his medication.

Plaintiff saw Dr. Ott again on October 25, 2007.   (R. at 446.)   Plaintiff reported some
improvement with his new medication regimen, but indicated that if he "overdoes it" he gets

swelling and pain for at least three days.   *Id.*   Dr. Ott noted limited range of motion in

Plaintiff's shoulders.   Upon review of x-rays of Plaintiff's feet from August 2007, Dr. Ott

suggested Plaintiff may have crystal deposition disease.   Dr. Ott adjusted Plaintiff's medication.

Plaintiff next saw Dr. Ott on December 20, 2007.   (R. at 444.)   Plaintiff indicated that

he had not had much improvement.   He stated that his feet were still becoming swollen twice

per week.   Plaintiff also reported pain and swelling in his right hand, as well as tightness and

stiffness.   Dr. Ott noted that Plaintiff was supposed to have been gradually increasing one of his

medications, but he had not done so.   Dr. Ott again recommended that Plaintiff increase that

specific medication, and also adjusted his other medications.   She also recommended that

Plaintiff see a podiatrist to address the issues with his feet.   (R. at 445.)

Plaintiff visited Dr. Ott again on February 26, 2008.   (R. at 442.)   Dr. Ott noted that

Plaintiff still had not increased his medication as she had instructed.   She also noted that

Plaintiff had not done lab work as she had directed.   Dr. Ott provided Plaintiff written

instructions to increase his medication.   She also adjusted other medications to help with the

continued pain and swelling.

Plaintiff presented to Dr. Ott on February 26, 2008, and reported that his new medication

provided relief for one week at a time.   (R. at 440.)   He further indicated that when his pain and

swelling returned after a week it was not as bad as it was previously.   Plaintiff complained of

continued pain in his feet, as well as diffuse pain all over his body.   Dr. Ott noted crepitus,

which is a term used to describe crackling or popping sounds and sensations, up to Plaintiff's

knees.   Dr. Ott also noted that Plaintiff had failed to get his lab work done as she instructed.

She stated that it is her "hope that as [Plaintiff] continues on a more consistent basis, he will continue to improve."  (R. at 441.)

Plaintiff did not see Dr. Ott again until March 4, 2009.  Dr. Ott noted that Plaintiff has a history of missing appointments, though she indicated her belief that he missed his most recent appointments due to a lack of insurance.  (R. at 708.)  She noted that Plaintiff had previously experienced relief with medication, but that he was not consistent in taking it.  Plaintiff reported experiencing pain and swelling in some area daily.  He indicated that his ankles, knees, hands and wrists hurt the worst.  On exam, Dr. Ott noted crackling and popping noises and sensations in Plaintiff's knees, as well as warmth in the right knee.  She also noted warmth over Plaintiff's ankles, and warmth and swelling in his elbows.  In addition, Dr. Ott noted pain with compression across the joints that connect the mid-foot to the toes.  Dr. Ott noted that Plaintiff is difficult to treat for a number of reasons, including his lack of consistency in treatment and his severe fear of needles.  Due to his fear of needles, Plaintiff is unwilling to try a new medication that Dr. Ott would otherwise prescribe.  She stated that she would prescribe those medications "because [Plaintiff] is generally very active and relatively healthy."  (R. at 709.)

**4.	Christopher Walker, D.P.M.**

Plaintiff treated with Dr. Walker, a Podiatrist, from February 2008 through at least February 2011.  (R. at 739-60.)  Dr. Walker initially recommended orthotics for conservative treatment.  (R. at 760.)  On August 10, 2009, however, Dr. Walker noted that Plaintiff expressed interested in discussing surgery for his bunions.  *Id.*  Dr. Walker recommended conservative treatment prior to considering surgery.  (R. at 759.)  Plaintiff proceeded with orthotics following that visit.  *Id.*  On January 4, 2010, Dr. Walker noted that Plaintiff reported

that he was not wearing his orthotics full time.   Plaintiff stated that he was considering surgery because the pain had not subsided.

On May 14, 2010, Dr. Walker performed surgery on Plaintiff's right foot to address his bunion deformity and hammer toe.   (R. at 751.)   On May 24, 2010, Plaintiff reported that he still was experiencing pain in his right foot.   (R. at 750.)   A week later, on June 1, Plaintiff indicated that his pain was getting better.   *Id.*   Two weeks after that, on June 14, Plaintiff reported continued pain from the right side of his foot down to the heel area.   Dr. Walker indicated that he would like to see Plaintiff decrease his pain medication and become more active.   (R. at 749.)   Over the next month, Plaintiff called Dr. Walker's office three times complaining of pain in his right foot and requesting pain medication.   *Id.*   He also complained of continued pain at his next appointment on July 21, 2010.   By September 2010, Plaintiff reported feeling only "minimal" pain, which he rated as a one on a ten-point scale.   (R. at 748.)

Plaintiff underwent surgery on his left foot to address hammer toe on October 15, 2010. (R. at 742.)   Two weeks after surgery Plaintiff complained of pain on the outer edge of his foot. (R. at 740.)   Plaintiff still complained of pain two months later in December and requested pain medication.   *Id.*

In January, 2011, Plaintiff reported continued tenderness.   Dr. Walker recommended new orthotics.   On January 31, 2011, Plaintiff saw Dr. Walker to be cast for orthotics.   Plaintiff reported pain that felt like he was stepping on needles.   Plaintiff visited Dr. Walker again on February 22, 2011 to be fitted for his new orthotics.   *Id.*

5.    **James J. Powers, M.D.**

On July 29, 2009, Dr. Powers examined Plaintiff at the request of the state agency.   (R. at 630-31.)   Plaintiff indicated that he stopped working due to progressively worsening pain and swollen joints.   He reported that he is independent in activities of daily living, and that he drives short distances.   Dr. Powers noted Plaintiff "moving about a little stiffly," but indicated that he was in no acute distress.   (R. at 630.)   He further noted that Plaintiff was tender to palpitation in the lower back, and that he could walk on his heels and in tandem.   Plaintiff complained of pain when attempting to walk on his toes.   Dr. Powers noted that Plaintiff has lost the arch in his foot, and that he is basically walking on the metatarsal heads of his feet, which is the area where the three middle toes meet the ball of the foot.   Dr. Powers reported that Plaintiff had normal capabilities in grasp, manipulation, pinch, and fine coordination.   (R. at 634.)   He also noted normal range of motion throughout Plaintiff's various joints.   *Id.*   Dr. Powers noted that Plaintiff has rheumatoid arthritis with particular involvement in the shoulders and feet.   He opined that Plaintiff would have difficulty in any job where he would be standing or walking or anything where he would be doing reaching or overhead lifting.   (R. at 631.)

6.    **Ronald Linehan, M.D.**

Plaintiff saw Dr. Linehan, a pain-management specialist, on June 23, 2008.   (R. at 451.) Plaintiff indicated that he experienced pain in his knees, ankle, and feet.   He described the pain as a constant, burning, and aching sensation.   Plaintiff further reported that his pain worsens with weightbearing, decreased rest, and elevation of his legs.   He rated his pain as an eight on a ten-point scale.   On exam, Dr. Linehan noted full range of motion in both knees and ankles,

10

though he noted pain during the exam.   He recommended a change in Plaintiff's medication.

He also suggested knee joint injections, but Plaintiff stated he was not interested.   (R. at 452.)

**7.     W. Jerry McCloud, M.D./Gerald Klyop, M.D.**

On September 1, 2009, Dr. McCloud reviewed the record on behalf of the state agency.

(R. at 638-41.)   Dr. McCloud opined that Plaintiff is limited to lifting or carrying 20 pounds

occasionally and ten pounds frequently; standing or walking two hours in an eight-hour

workday; and sitting for six hours in an eight-hour workday.   (R. at 677.)   In addition, Dr.

McCloud opined that Plaintiff is limited in his ability to push and pull with his lower extremities.

He indicated that Plaintiff is able to climb ramps and stairs occasionally and crouch occasionally,

but that he is unable to climb ladders, ropes or scaffolds.   (R. at 678.)   Dr. McCloud further

opined that Plaintiff is limited to occasional overhead reaching, and that he should avoid

concentrated exposure to hazards.   (R. at 679-80.)

On March 25, 2010, state agency physician, Dr. Klyop, affirmed Dr. McCloud's

assessment.   (R. at 707.)

**8.     Martin J. Andrews, M.D.**

On January 13, 2010, Plaintiff saw Dr. Andrews, a pain-management specialist, pursuant

to the referral of Dr. Walker.   Plaintiff complained of pain radiating from his lower back down

his legs.   Dr. Andrews noted in his assessment that Plaintiff suffers from pain due to multilevel

degenerative disc disease and disc bulging.   He recommended epidural steroid injections, but

Plaintiff indicated that he did not want to undergo injections.

11

9.    **Jonathan Pearlman, M.D.**

Dr. Pearlman ordered x-rays of Plaintiff's knees, which were taken on January 12, 2011.

(R. at 712.)   The x-rays revealed small joint effusion, which is the presence of increased fluid, in

the left knee.   The results were normal with respect to Plaintiff's right knee.   Plaintiff also

underwent x-rays of his lower back on January 12, 2011.   (R. at 714.)   The results revealed

progressive disc space narrowing at two points on Plaintiff's spine, which had progressed from

the last MRI of the area taken on May 6, 2008.   *Id.*

On April 4, 2011, Plaintiff complained to Dr. Pearlman that he felt pain all over.   (R. at

764.)   He indicated feeling pain throughout his shoulders, hands, lower back, and knees.   He

indicated that his hands were swollen, causing him difficulty with gripping.   On exam, Dr.

Pearlman noted normal upper extremity strength, and moderate puffiness in Plaintiff's hands.

He further noted that Plaintiff's grip strength was limited due to pain.   He noted that Plaintiff

had full range of motion in his knees, and was able to transfer from a sitting position to standing

without discomfort.   Dr. Pearlman also noted Plaintiff's gait as normal and balance as good.

*Id.*   Dr. Pearlman adjusted Plaintiff's medications.   During that visit, Plaintiff reported his pain

at a four on a ten-point scale, which Dr. Pearlman interpreted as "pain [that] can be ignored if

really involved in work, but it is still distracting."   *Id.*

Also on April 4, 2011, Dr. Pearlman completed a form related to Plaintiff's physical

capacity.   (R. at 763.)   He opined that Plaintiff could never engage in pushing, pulling, bending,

reaching, handling, or repetitive foot movements.   *Id.*   He further opined that Plaintiff is unable

to work an eight-hour workday, and that he could complete zero hours of work in a day.   In

addition, Dr. Pearlman opined that Plaintiff is limited to thirty minutes of standing and walking

in an eight-hour day with fifteen minutes of continuous standing or walking without interruption; and thirty minutes of sitting in an eight-hour day with fifteen minutes of continuous sitting without interruption.  *Id.*

## B.    Mental Impairments

### 1.    Marc E. W. Miller, Ph.D.

On June 12, 2007, Dr. Miller examined Plaintiff on behalf of the state agency.  (R. at 335-39.)  Plaintiff indicated that he quit school in the eleventh grade.  (R. at 335.)  He stated that he struggled throughout school and was taking special education classes.  Plaintiff reported that he had to quit his job as a maintenance man due to his physical condition.  Dr. Miller noted that Plaintiff tends to walk on his heels due to his arthritic condition.  (R. at 336.)  He noted that Plaintiff is fair at making change with money, and that he has difficulty reading a newspaper.  Dr. Miller noted mild delayed processing during the examination.  In terms of daily activities, Plaintiff reported that he goes to bed at 11:00 p.m. and wakes up at 7:00 a.m. He stated that he eats two meals per day.  He visits with family and watches television.  He stated that his daughters help with meals, laundry, cleaning and dishes.  They also do the grocery shopping.  Plaintiff indicated that he performs basic money management with the assistance of his oldest daughter or his mother.

Dr. Miller administered the Wechsler Adult Intelligence test.  (R. at 337.)  Plaintiff scored a 73 in the verbal IQ, a 69 in the performance IQ, and 69 in the full scale IQ, placing him in the 4th, 2nd and 2nd percentiles, respectively.  *Id.*  Based on his test results Dr. Miller noted that Plaintiff appears to be functioning within the mild mental retardation range of intellect.  Dr. Miller also administered the Wechsler Memory Scale test, on which Plaintiff scored in the

ranges of borderline to extremely low abilities with respect to his memory.   (R. at 337-38.)

Nevertheless, Dr. Miller indicated that Plaintiff does not meet the criteria for mild mental

retardation, "as he is able to communicate effectively, exhibit self-care, home living, and social

interpretation."   (R. at 338.)   In addition, Dr. Miller noted that although Plaintiff functions at a

low intellectual level, he has worked in the past in positions that require him to follow directions.

In addition, he opined that Plaintiff suffers no impairment in his ability to interact with

coworkers, supervisors and the public; and mild impairment in his abilities to maintain attention

span and concentration; deal with stress and pressure in a work setting; and maintain persistence

in task completion.   *Id.*

Dr. Miller evaluated Plaintiff for a second time on August 4, 2009.   (R. at 644-46.)   The

results of his second examination were the same as his first, except that Dr. Miller opined that

Plaintiff suffers moderate (rather than mild) impairment in his ability to deal with stress and

pressure in a work setting and to maintain persistence in task completion.   (R. at 645.)   Dr.

Miller noted that Plaintiff's last examination noted a full scale IQ of 69, which "appears to be

valid."   *Id.*

## 2.    Steven J. Meyer, Ph.D.

On June 25, 2007, Dr. Meyer reviewed Plaintiff's mental health records on behalf of the

state agency.   (R. at 340-43.)   Dr. Meyer opined that Plaintiff suffers moderate impairment in

his ability to understand and remember detailed instructions; carryout detailed instructions;

maintain attention and concentration for extended periods; complete a normal workday and

workweek without interruptions from psychologically based symptoms; and respond

appropriately to changes in work setting.   (R. at 340-41.)   Dr. Meyer concluded that Plaintiff is

able to perform simple to moderately complex routine tasks, with oral and hands-on instructions and regular expectations.   (R. at 342.)

**3.      Mel Zwissler, Ph.D./Roseann Umana, Ph.D.**

On August 19, 2009, Dr. Zwissler reviewed the record on behalf of the state agency.   (R. at 647-663.)   Dr. Zwissler opined that Plaintiff suffers from mild mental retardation that does not meet the requirements of Listing 12.05.   (R. at 651.)   He also opined that Plaintiff suffers moderate limitations in his ability to maintain concentration, persistence of pace; and mild limitations in his ability to maintain social functioning and perform activities of daily living. (R. at 657.)   He concluded that Plaintiff is capable of performing simple, routine tasks, interacting with others, and adapting to basic changes in routine.   (R. at 663.)

In March 2010, state agency psychologist, Dr. Umana, reviewed the record, including Plaintiff's 1975 school records, and affirmed Dr. Zwissler's assessment.   (R. at 706.)

**C.      Education Records**

School records from the Logan-Hocking School District document that Plaintiff completed the 11th grade in special education classes.   (R. at 193-200, 300-31.)

Plaintiff underwent testing at age 13, while in the 8th grade, which revealed him to be functioning in the "low average" range of intelligence.   He scored a 77 on the verbal IQ test; 95 on the performance IQ test; and 84 on the full IQ test.   (R. at 310.)

### IV. THE ADMINISTRATIVE DECISION

On April 29, 2011, the ALJ issued his decision.   (R. at 18-28.)   At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.   *See* 20 C.F.R. §416.920(a)(4).   Although a dispositive finding at any step

gainful activity since April 4, 2007.   (R. at 20.)   The ALJ further found that Plaintiff suffers

from the severe impairments of a history of hammertoes, status post bilateral foot surgeries;

rheumatoid arthritis; degenerative disc disease of the lumbar spine; and depression.   *Id.*   He

further found that Plaintiff does not have an impairment or combination of impairments that

meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart

P, Appendix 1.   (R. at 21.)   At step four of the sequential process, the ALJ evaluated Plaintiff's

residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform a range of light work as defined in 20 CFR
> 404.1567(b) and 416.967(b).   The claimant can lift and/or carry and push and/or
> pull a maximum of 20 pounds occasionally and 10 pounds frequently; sit for four
> hours at a time and a total of eight hours during an eight hour work day; and walk
> and/or stand up to two hours at a time and a total of six hours during an eight hour
> work day.   The claimant is precluded from climbing ladders, ropes, or scaffolds;
> and more than occasional climbing of ramps or stairs.   He can perform
> occasional balancing, stooping, kneeling, crouching or crawling; but is precluded
> from more than occasional (up to one-third of the day) overhead reaching
> bilaterally; and should avoid concentrated exposure to vibrations.   The claimant
> is further limited to simple, unskilled, and repetitive tasks.

(R. at 22.)   In reaching this determination, the ALJ assigned "significant weight" to the opinions

of Drs. Villanueva, McCloud, and Klyop, finding that the objective medical and other credible

---

terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully
considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or
     equal the criteria of an impairment set forth in the Commissioner's Listing of
     Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant
     perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual functional
     capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

evidence of record supported their assessments.   (R. at 26.)   The ALJ found Dr. Power's

assessment to be "generally consistent with the record."   *Id.*   The ALJ assigned "significant

weight" to Dr. Miller's opinions, except his diagnoses of borderline intellectual functioning.   *Id.*

With respect to that diagnoses, the ALJ concluded that Plaintiff's IQ scores from when he was

tested as a child indicate that the borderline functioning diagnoses is inappropriate.

Specifically, the ALJ noted that the listings require a finding that the claimant had an IQ in the

60 through 70 range before the age of 22.   Because Plaintiff scored beyond that range at age 13,

the ALJ concluded that a diagnoses consistent with the Listings was inappropriate.   In addition,

the ALJ assigned "significant weight" to the psychological opinions of the state agency

reviewing professionals, Drs. Meyer, Zwissler and Umana, finding their assessments consistent

with the record as a whole.   *Id.*   The ALJ afforded "no weight" to the limitations identified by

Dr. Pearlman.   *Id.*

        Based on the foregoing, the ALJ concluded that that Plaintiff's medically determinable

impairments could reasonably be expected to cause his alleged symptoms, but that Plaintiff's

statements concerning the intensity, persistence and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the assigned RFC.   (R. at 23.)

        Relying on the VE's testimony, the ALJ determined that jobs exist in the state and

national economy that Plaintiff can perform.   (R. at 27-28.)   He therefore concluded that

Plaintiff is not disabled within the meaning of the Social Security Act.   (R. at 28.)

# V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007)).

## VI. LEGAL ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ committed reversible error

when he concluded that (1) Plaintiff does not meet the Listing of 14.09(A); (2) Plaintiff does not

meet the Listing of 12.05(C); (3) Dr. Pearlman's RFC opinion is entitled to no weight; and (4)

Plaintiff has a limited education.   The Undersigned disagrees, and concludes that the ALJ did

not commit reversible error.   The Undersigned further concludes that substantial evidence

supports the ALJ's decision.

## A.      Plaintiff does not meet the Listings of 14.09(A)

Plaintiff contends that the ALJ erred in concluding that he does not meet the Listing of

14.09(A) for rheumatoid arthritis resulting in an inability to ambulate affectively.   (Statement of

Errors 11-12, ECF No. 9.)   The Listing "describes, for each of the major body systems,

impairments which are considered severe enough to prevent a person from doing any gainful

activity."   20 C.F.R. § 404.1525.   A claimant's impairment must meet every element of a

Listing before the Commissioner may conclude that he or she is disabled at step three of the

sequential evaluation process.   20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human*

*Servs.*, 801 F.2d 847, 855 (6th Cir. 1986).   The claimant has the burden to prove that all of the

elements are satisfied.   *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir.

1984).   The regulations provide that in making a medical equivalence determination, the Social

Security Administration will "consider the opinion given by one or more medical or

psychological consultants designated by the Commissioner."  20 C.F.R. § 404.1526(c).

Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable

the Secretary to make a disability determination rests with the claimant."  *Landsaw v. Sec'y of*

*Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986).   It is not sufficient to come close to

meeting the conditions of a Listing.  *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.

1989) (Commissioner's decision affirmed where medical evidence "almost establishes a

disability" under Listing).

Listing 14.09(A)(1) provides for a finding of disability when a claimant suffers from

inflammatory arthritis with "persistent inflammation or persistent deformity of one or more

major peripheral weight-bearing joints, resulting in an inability to ambulate effectively."  20

C.F.R. Part 404, Subpt. P, App. 1, § 14.09(A)(1).   The Regulations define an inability to

ambulate effectively as:

> an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes
> very seriously with the individual's ability to independently initiate, sustain, or
> complete activities.   Ineffective ambulation is defined generally as having
> insufficient lower extremity functioning (see 1.00J) to permit independent
> ambulation without the use of a hand-held assistive device(s) that limits the
> functioning of both upper extremities.
>
> . . .   To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living.   They must have the ability to travel without companion
> assistance to and from a place of employment or school.   Therefore, examples of
> ineffective ambulation include, but are not limited to, the inability to walk without
> the use of a walker, two crutches or two canes, the inability to walk a block at a
> reasonable place on rough or uneven surfaces, the inability to use standard public
> transportation, the inability to carry out routine ambulatory activities, such as
> shopping and banking, and the inability to climb a few steps at a reasonable pace
> with the use of a single hand rail.   The ability to walk independently about one's
> home without the use of assistive devices does not, in and of itself, constitute
> effective ambulation.

20 C.F.R. Part 404, Subpt. P, App.1, § 100(B)(2)(b)(1)-(2).

Here, the ALJ concluded that Plaintiff's "rheumatoid arthritis fails to establish the required inability to ambulate" within the meaning of Listing 14.09(A)(1). (R. at 21.) Substantial evidence supports the ALJ's conclusion.

First, the medical evidence demonstrates that Plaintiff does not suffer an inability to ambulate effectively. When examined by Dr. Powers in 2009, Plaintiff was able to walk on his heels and in tandem. (R. at 631.) Dr. Powers also noted callus on the bottom of Plaintiff's feet due to walking. *Id.* Although Dr. Powers opined that Plaintiff would experience difficulty in a job that required standing or walking, he did not go so far as to report that Plaintiff is unable to ambulate. Moreover, state agency physicians Drs. Villanueva, McCloud and Klyop reviewed Plaintiff's medical records, including the opinions of Dr. Powers and Plaintiff's treating physicians, and concluded that Plaintiff should limit his standing and walking to four to six hours per day rather than preclude it altogether. (R. at 359, 678, 707.) Finally, even Dr. Pearlman, upon whose opinion Plaintiff heavily relies, noted Plaintiff's gait as normal, his balance as good, and his strength as normal in both legs. (R. at 764.) During that visit, Plaintiff reported his pain at a four on a ten-point scale, which Dr. Pearlman interpreted as "pain [that] can be ignored if really involved in work, but it is still distracting." *Id.*

In addition, when Plaintiff has been compliant with his medication, he reported significant improvement in the pain and swelling of his feet. (R. at 440.) Specifically, he reported an absence of pain and swelling for a week at a time with a certain medication. *Id.* When the pain and swelling returned after a week, Plaintiff reported that the symptoms were less severe than they were prior to the medication. Dr. Ott noted that Plaintiff achieved these results

after taking the medication for only a short period.   She indicated that Plaintiff's condition

would continue to improve if he would continue with the medication on a consistent basis.   (R.

at 441.)

Furthermore, the record contains no evidence that Plaintiff requires the use of hand-held

assistive devices requiring the use of both of his arms, as the Listing requires.   20 C.F.R. Part

404, Subpt. P, App.1, § 100(B)(2)(b)(1).   None of the physicians who examined Plaintiff,

including his treating physicians, noted that Plaintiff required the use of an assistive device for

ambulation.   Although Plaintiff testified at the hearing that he requires the assistance of a walker

in the mornings to steady himself and to get up, and that he used crutches for approximately a

year before that (R. at 48), the record contains no evidence that Plaintiff uses a walker

throughout the day or that he requires the aid of crutches to ambulate.   In addition, the ALJ

concluded that Plaintiff's testimony concerning the use of crutches lacks credibility.   (R. at

23-24.)   As the ALJ points out, Plaintiff reported to Dr. Walker in September 2010 that his pain

had subsided to a one on a ten-point scale.   (R. at 748.)   This would have been during the

period in which Plaintiff claims to have required the aid of crutches.   The ALJ also pointed out

that Plaintiff proceeded to have surgery on his left foot in October 2010, which suggests that the

procedure on the right foot was a success.   Moreover, Dr. Walker did not make any notation in

his records during that year-long period indicating that Plaintiff relied on crutches to ambulate or

that he required a walker to get up.   For all of these reasons, the ALJ did not err in concluding

that Plaintiff failed to establish an inability to ambulate within the meaning of § 14.09(A)(1).

Plaintiff's contrary arguments are not well taken.   Plaintiff first relies heavily on his own

testimony that he requires the use of a walker and has used crutches in the past, as well as his

testimony that he can no longer drive due to pain in his feet. The ALJ, however, determined that Plaintiff's testimony in this regard lacks credibility. (R. at 23-24.) In addition, as set forth above, Plaintiff's testimony conflicts with the objective medical evidence. Plaintiff also points to medical evidence demonstrating that he suffers from pain in his feet as evidence of an inability to ambulate. There is no question that Plaintiff experiences pain and swelling in his feet; but the issue is whether his symptoms prevent him from ambulating. *See Adams v. Astrue*, No. 3:10-cv-180, 2011 WL 2559541, *3 (S.D. Ohio June 28, 2011) ("That Plaintiff has severe foot problems is not for debate[; however a]t issue is whether his foot problems meet the strictures of [the Listings].") . For the reasons set forth herein, Plaintiff has not met his burden of establishing an inability to ambulate within the meaning of the Listings.

**B.      Plaintiff does not meet the Listings of 12.05(c)**

Plaintiff next contends that the ALJ erred in concluding that he does not suffer from mild mental retardation with the Listings of 12.05(c). That listing provides as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when . . . [the claimant] has demonstrated a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function[.]"

20 C.F.R. Part 404, Subpt. P, App.1 S 12.05(C). Consequently, to meet the listing a claimant must demonstrate that he (1) experiences "significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period," (2) has a "valid verbal, performance, or full scale IQ of 60 through 70,"

and (3) suffers from a "physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*; *West v. Comm'r of Soc. Sec.*, 240 Fed. App'x 692, 697 (6th Cir. 2007).

Here, the ALJ correctly concluded that Plaintiff's mental impairments do not meet the Listings of 12.05(c) because the record does not support onset of a mental impairment before the age of 22. (R. at 22.) As the ALJ pointed out, although Plaintiff scored at the range of 69-73 on an IQ test he took in 2007, he scored in the range of 77 to 99 when he took an IQ test at age 13. *Id.*

Plaintiff maintains that the Regulations require only a showing of an onset of "significantly subaverage" intelligence prior to age 22. (Statement of Specific Errors 12, ECF No. 9.) He contends that although his IQ scores from when he was a child exceed the 60 to 70 range required for the disorder to be met, he nevertheless proved "subaverage" intelligence with his childhood scores that ranged between 77 and 99. *Id.* Specifically, Plaintiff's verbal IQ as a child was in the 3rd to 9th percentile, which he contends meets the requirement of "subaverage" intelligence. *Id.*

The Court need not determine the contours of the meaning of "subaverage" intelligence, however, because even if Plaintiff's childhood IQ scores satisfy this prong of the listings, Plaintiff has provided no evidence that he suffers deficiencies in adaptive functioning, much less that the deficiencies arose prior to age 22, as the listings require. Adaptive functioning refers to a plaintiff's abilities in the areas of social skills, communication, and daily living skills. *West*, 240 Fed. App'x at 698 (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). Here, the ALJ pointed out that Plaintiff testified that he lived on his own as an adult for over a year. (R. at 22.)

24

In addition, Plaintiff reported to Dr. Powers that he is independent in his activities of daily living.  (R. at 360.)   He also indicated that he gets the mail, straightens his bed, helps put groceries away, visits with family, and makes sandwiches for himself.  (R. at 54, 60, 336.)   In addition, Plaintiff successfully maintained a job as a maintenance man at an apartment complex for ten years.  *See Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("Foster's work as an accounting clerk at a bank and a liquor store prior to injuring her leg demonstrate that she had the ability to perform relatively complicated tasks prior to the injury of her leg.").   Nor does the record indicate that Plaintiff suffered deficiencies in adaptive functioning prior to the age of 22. He attended school through the eleventh grade.  (R. at 335.)   Although he dropped out of school before graduating, he reportedly did so in order to get a job, not because he was experiencing difficulty in adaptive functioning.  *Id.*

Also, the examining mental-health professional who examined Plaintiff opined that he does not meet the criteria for mild mental retardation.   Dr. Miller noted that although Plaintiff scored low on his IQ test, "he is able to communicate effectively, exhibit self[-]care, home living, and social interpretation."  (R. at 338.)   Dr. Miller also noted that Plaintiff has worked in positions that require him to follow directions.   He further reported that Plaintiff is "fair" at making change with money.   He concluded that Plaintiff suffers no limitation in his ability to interact with coworkers, supervisors, or the public.  *Id.*

Moreover, three state-agency professionals who reviewed Plaintiff's mental-health records, including the opinion of Dr. Miller, opined that Plaintiff is capable of at least simple, routine tasks.   Dr. Meyer opined that Plaintiff is able to perform simple to moderately complex, routine tasks with oral and hands-on instructions and regular expectations.  (R. at 342.)   Dr.

25

Zswiller opined that Plaintiff is capable of performing simple, routine tasks, interacting with others, and adapting to basic changes in routine. (R. at 663.) Lastly, Dr. Umana affirmed Dr. Zswiller's assessment. (R. at 706.)

In challenging the ALJ's finding, Plaintiff suggests that the ALJ should have ordered further IQ testing to determine whether he met the Listings of 12.05(c). (Statement of Specific Errors, 13, ECF No. 9.) Specifically, Plaintiff contends that "if there was a question as to the validity of the IQ score, the ALJ should have referred the claimant out for IQ testing to confirm or rebut the results obtained by Dr. Miller." *Id.* An ALJ, however, is not required to order additional testing when the record contains sufficient evidence to conclude that a claimant does not meet the listings. *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 355). As the Sixth Circuit recognized in *Hayes*, a low IQ test "is not sufficient by itself to satisfy Listing 12.05." *Hayes*, 357 Fed. App'x at 675. Thus, even if additional testing confirmed that Plaintiff has a sufficiently-low IQ, he would still not meet the listings because he has provided no evidence of deficiency in adaptive functioning either as an adult or during his developmental period. Accordingly, the ALJ did not err in concluding that Plaintiff does not meet the Listings of 12.05(c).

**C.     The ALJ did not err in according no weight to Dr. Pearlman's opinion**

Plaintiff next contends that the ALJ committed reversible error in according no weight to Dr. Pearlman's 2011 opinion. The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis,

26

what you can still do despite impairment(s), and your physical or mental restrictions."   20

C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone . . . ."   20 C.F.R.

§ 416.927(d)(2); *Blakley*, 581 F.3d at 408.   If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight."   20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ

must meet certain procedural requirements.   *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

(6th Cir. 2004).   Specifically, if an ALJ does not give a treating source's opinion controlling

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion."   20

C.F.R. § 416.927(d)(2).   Accordingly, the ALJ's reasoning "must be sufficiently specific to

make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight."   *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

27

2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted).   The United States Court

of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.
> *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.   Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled."   *Germany-Johnson v.

Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity.   20 C.F.R. § 404.1527(e).   Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance.   20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, even assuming Dr. Pearlman qualifies as a treating physician, the ALJ provided

good reasons for rejecting his opinion, which are supported by substantial evidence.[1]   As the

ALJ points out, Dr. Pearlman's conclusion that Plaintiff is capable of absolutely no work

conflicts with his own treatment note.   (R. at 23.)   Specifically, in his treatment note Dr.

Pearlman indicated that Plaintiff has normal gait, normal strength in both legs, and good balance.

(R. at 764.)   He further reported that Plaintiff was in "no acute distress," and that he was able to

---

[1]  The Commissioner posits that Dr. Pearlman does not qualify as a treating physician because he
only saw Plaintiff approximately two times.   (Op. 10, ECF No. 14.)   Because such a finding is
unnecessary to the outcome of this case, the Court need not and does not decide whether Dr.

transition from a sitting to standing position without discomfort.  *Id.*  Dr. Pearlman also noted

Plaintiff's pain at a four, which he characterized as pain through which Plaintiff could work,

albeit with some distraction.  *Id.*

Moreover, the medical evidence contradicts Dr. Pearlman's finding of such severe

limitations.  Every other physician to examine Plaintiff or review his medical records concluded

that he suffers less-restrictive limitations.  (R. at 631, 361, 679-80.)  In addition, records from

Plaintiff's treating physician, Dr. Ott, contain no indication that Plaintiff suffers limitations to the

extent set forth in Dr. Pearlman's assessment.  Rather, Dr. Ott noted improvement with

medication, and indicated that Plaintiff would improve even more if he maintained compliance

with his medication.  (R. at 441.)

In addition, the ALJ noted two other issues with Dr. Pearlman which factor into the

weight to accord his opinion.  As the ALJ pointed out, the record contains only one treatment

note from Dr. Pearlman.  (R. at 24.)  In addition, Dr. Pearlman is a pain specialist.  Both length

of treatment relationship and practice specialty are valid considerations in determining the

weight to accord a treating physician's opinion.  *Wilson*, 378 F.3d at 544.

Plaintiff contends that the ALJ failed to consider that Dr. Pearlman referenced a 2011

MRI report in his opinion.  (Statement of Specific Errors 14, ECF No. 9.)  Dr. Pearlman

submitted his opinion three weeks after the administrative hearing.  In his treatment note that

accompanied his opinion, Dr. Pearlman listed the results of a January 2011 MRI in a box marked

"data reviewed."  The ALJ indicated in his decision that Dr. Pearlman's opinion included "no

new objective medical testing."  *Id.*  Plaintiff posits that the ALJ's statement is inaccurate

because, he asserts, the January 2011 MRI that Dr. Pearlman referenced in his treatment note

---

Pearlman qualifies as a treating physician.

constitutes new objective medical testing. As the Commissioner points out, however, the January 2011 MRI results were part of the record before Dr. Pearlman referenced them in his April 2011 treatment note. (R. at 711.) Thus, the ALJ was correct to indicate that Dr. Pearlman had provided no new objective medical testing.

Even assuming the record did not contain the MRI results prior to the opinion, the MRI results do nothing render Dr. Pearlman's RFC opinion deserving of more weight. The 2011 MRI did not reveal abnormalities severe enough to warrant the limitations Dr. Pearlman imposed. Nor did Dr. Pearlman indicate that he relied on the MRI results in formulating his RFC opinion. (R. at 764.) Although he included the MRI in a section labeled "data reviewed" in his treatment note, *id.*, Dr. Pearlman does not mention the MRI at all in his RFC opinion. Rather, he references his treatment note from his visit with Plaintiff. As discussed above, however, that treatment note contradicts the severe limitations set forth in Dr. Pearlman's RFC opinion.

Accordingly, the ALJ provided good reasons for rejecting Dr. Pearlman's RFC opinion. Furthermore, for the reasons set forth above, the Undersigned concludes that the ALJ's conclusion is supported by substantial evidence.

**D.     The ALJ did not err in Finding Plaintiff has a Limited Education**

Finally, Plaintiff contends that the ALJ erred in determining that he had a limited education. (Statement of Specific Errors 13, ECF No. 9.) Pursuant to the Regulations, an individual is considered to have a "limited education" if he possess abilities in "reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs."

30

20 C.F.R. § 404.1564(b)(3). Generally, a "7th grade through 11th grade level of formal education is a limited education." *Id.* A claimant is considered to have a "marginal education," on the other hand, when he maintains "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs." 20 C.F.R. § 404.1564(b)(2). Generally, "formal schooling at a 6th grade level or less is a marginal education." *Id.* The only level of education falling below a marginal education is "illiteracy." The Regulations provide that "[i]lliteracy means the inability to read or write." 20 C.F.R. § 404.1564(b)(2). A person is considered illiterate if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *Id.* In addition, generally "an illiterate person has had little or no formal schooling." *Id.*

Here, Plaintiff contends that the ALJ concluded that he had a "'limited education,' presumably based on [the fact that] Plaintiff completed the 11th grade." (Statement of Errors 13, ECF No. 9.) According to Plaintiff, testing he completed in the 12th grade documented performance at the third to fifth grade level. *Id.* Plaintiff does not indicate which education level he believes is appropriate. He merely asserts that "there [is] no evidence establishing that he could perform the jobs cited in the decision with such low academic functioning." *Id.* The Undersigned disagrees.

First, although the ALJ referenced "a[n] eleventh grade *special* education" in his hypothetical questioning to the VE, the mental limitations set forth in the RFC are consistent with a "marginal education." Specifically, the ALJ's RFC limits Plaintiff to "simple, unskilled, and repetitive tasks." (R. at 22.) A marginal education allows for "simple, unskilled types of jobs." 20 C.F.R. § 404.1564(b)(2). Accordingly, the ALJ's RFC is consistent with a finding of

a marginal, rather than limited, education. Even placing Plaintiff at a third to fifth grade education level, as his twelfth grade testing indicated, he would be considered to have a marginal education. *See also* SSR 96-9p ("Basic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient.").

In addition, as the ALJ points out in his opinion, the examining and reviewing physicians found Plaintiff capable of performing simple tasks and engaging in social functioning, which is consistent with a marginal education and the ALJ's RFC. Dr. Miller concluded that Plaintiff possesses "fair" capabilities to make change with money. (R. at 336.) Plaintiff reported to Dr. Miller that he performs basic money management with some assistance from family. *Id.* Dr. Miller concluded that Plaintiff has no impairment in his ability to interact with coworkers, supervisors, and the public. *Id.* In doing so, he specifically referenced Plaintiff's prior work experience, which is relevant to determining a claimant's education level. *Range v. Soc. Sec. Admin.*, 95 Fed. App'x 755, 757 (6th Cir. 2004) ("The regulation notes that past work experience and the kind of responsibility the claimant had when the claimant was working could show the intellectual abilities of the claimant."). In addition, Drs. Meyer, Zwissler and Umana all concluded that Plaintiff is capable of performing simple, routine tasks and interacting with others. (R. at 342, 663, 706.) The Court of Appeals has found similar evidence sufficient to support even a limited education. *See also Caudill v. Comm'r of Soc. Sec.*, 424 Fed. App'x 510, 516 (6th Cir. 2011) (upholding ALJ's finding of limited education where the plaintiff admitted to being able to read and write a grocery list; the plaintiff successfully worked for many years; an examining physician opined he had a fair ability to understand, retain and follow instructions;

32

and he attended school into the twelfth grade and his school records showed that he averaged Bs, Cs, and Ds in high school").   Accordingly, the ALJ did not err in including into his RFC limitations consistent with a marginal education.

## VII. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

33

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 31, 2013                          _____*/s/ Elizabeth A. Preston Deavers*_____
                                                Elizabeth A. Preston Deavers
                                                United States Magistrate Judge